## CLAIR O. DORNE v. ELIZABETH N. WILLIAMS, EXECUTRIX (ESTATE OF HARRIETT C. WILLIAMS)

SUPERIOR COURT    NEW LONDON COUNTY    FILE No. 19260

Memorandum filed January 16, 1952.

*Richard F. Corkey,* of New London, for the Plaintiff.

*Charles V. James,* of Norwich, for the Defendant.

ALCORN, J. The amended complaint, stated in four counts, claims damages, the reformation of a written agreement or, in the alternative, a declaratory judgment, and such other relief as to justice and equity may appertain. The claim for a declaratory judgment has been abandoned.

The decedent was a woman seventy-five or more years old. She owned land at Crescent Beach, so-called, in the town of East Lyme, on which stood a three-story, duplex house known as the "Old Homestead" and a former garage two stories high which had been remodeled to contain two apartments. The whole property is valued in her estate at $8600. The decedent used the front or southerly half of the "Old Homestead," which will hereinafter be referred to as the main house, as a summer residence. The main house was about fifty years old, of so-called "open type" frame construction without interior sheathing or plastering and with shingled roof and sides. The remodeled apartment building in the rear was of like construction with shingled roof and novelty siding. Both buildings were served by outside toilets and water from a well in the yard was manually pumped to kitchen sinks in each building. There were leaks in the roof and around some of the windows of the main house and its trim needed painting. The decedent had been content with it for a summer home in this condition.

The plaintiff had known the decedent about eight years through renting summer vacation quarters from her. On September 19, 1947, he leased the north half of the main house and the two garage apartments with the right to sublet and make alterations for ten years at a monthly rent of $30, agreeing "to take said premises as they now are," and "that no damage shall be claimed of said Lessor for injury to the property of said Lessee in said premises caused by water or the elements, or dampness." During that summer the decedent had become annoyed by leaks in the south part of the main house. After a discussion at the time of making the lease, the plaintiff undertook to make temporary repairs with the understanding that he and the decedent would get together the next summer on the cost of repairs and how to meet them.

In the early summer of 1948 the decedent returned from her winter residence in Florida, and the parties undertook to obtain estimates for further work to be done. The plaintiff showed contractors through the property and indicated to them, in the decedent's absence, the work he proposed. The lowest estimate obtained approximated $12,000. This was communicated to the decedent, who balked at such an expenditure and put off doing anything. Later in the summer she was again plagued by leaks and decided to put a new roof and siding on the main house. Discussion ensued about the plaintiff undertaking the work and the decedent paying one-half the cost. The plaintiff protested that such a proposal was not fair to him under his present lease. The plaintiff offered to undertake the project, however, if the decedent would give him a ten-year lease with a ten-year renewal privilege covering the north half of the main house and the apartments in the rear. The plaintiff's objective was to obtain through rentals derived from subletting, reimbursement for his portion of the expense.

On September 18, 1948, the parties exchanged receipts, and executed a written lease. This lease was identical in all material respects with the 1947 lease except that it included the right of renewal for a further period of ten years under the same terms and conditions, and specified that it superseded and released the 1947 lease.

On the same date the parties signed a written agreement reciting, in part, that "WHEREAS the parties hereto have this day executed a lease pertaining to the northerly one-half of a house on Washington Avenue, Crescent Beach, in the Town of East Lyme, Connecticut, known as The Homestead, and

"WHEREAS the parties are desirous of entering into an Agreement regarding repairs to be made to said premises, and the cost of such repairs. . . . .

"1. The said Dorne shall make such repairs as are necessary to the premises, including new roof, siding, painting, new steps, new water system and such other repairs as are deemed necessary by the said Dorne.

"2. The cost of repairs shall be shared equally by both parties. . . .

"4. The said Williams agrees to pay for her share of the repairs by allowing the said Dorne to apply monthly rentals of Thirty (30) Dollars each month, as provided in the lease, on

account of such repairs. The said Dorne is hereby authorized and directed not to pay such rentals to the said Williams during any month when there is a balance due from the said Williams on account of her share of the above mentioned costs of repairs, but he is authorized and directed to withhold payment of said rentals and to apply them on account of repairs as provided herein."

The lease and the agreement were drawn by the plaintiff and witnessed by his wife and mother. The decedent examined them before signing, stated that they correctly represented the agreement reached, and executed them. She left within a few hours thereafter for her winter home in Florida. On the way to the railroad station she voiced an intention of selling a piece of property in Florida in order to use the proceeds to pay her share of the expense under the agreement. This conversation is relied upon by the plaintiff as the basis for a recovery under the second, third and fourth counts of the complaint. The evidence of that conversation, however, does not establish an oral agreement such as that alleged. On the contrary, it goes no farther than to indicate a method the decedent had in mind for meeting her share of the expense and terminating the withholding of the rents by the plaintiff.

There remains to consider, therefore, whether the plaintiff is entitled to recover under the first count for expenditures pursuant to the written contract. The decedent never returned to the property, but died in Florida on June 5, 1949. On November 28, 1949, and within the time limited by the Probate Court, the plaintiff filed a claim for $6570.50, with interest, based upon "Services rendered to Harriett C. Williams at her request and for her benefit between the years 1949 and 1950 as per lease and agreement," the lease and agreement referred to being those of September 18, 1948. The claim was disallowed in full.

In construing the written agreement the intent which the parties expressed therein is the controlling element. *Roessler* v. *Burwell,* 119 Conn. 289, 295. The aim is to ascertain what the scrivener of the agreement intended by what he said rather than to put words into his mouth or to give effect to that which it may be thought he intended to say or would have wished to say but did not. *Boucher* v. *Godfrey,* 119 Conn. 622, 629; *Trumbull Electric Mfg. Co.* v. *John Cooke Co.,* 130 Conn. 12, 15; *Hansel* v. *Hartford-Connecticut Trust Co.,* 133 Conn. 181, 194. The intention of the parties is to be determined from the

language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction, and the question is what intention is expressed in the language used. *Ives* v. *Willimantic,* 121 Conn. 408, 411; *Preston* v. *Verplex Co.,* 135 Conn. 187, 189. For the purpose of discovering the intention of the parties their situation and the circumstances in connection with the transaction may be considered and the language interpreted with the help of that evidence. *Bronx Derrick & Tool Co.* v. *Porcupine Co.,* 117 Conn. 314, 318. The language used must be given its ordinary meaning unless a technical or special meaning is clearly intended. *Perkins* v. *Eagle Lock Co.,* 118 Conn. 658, 663; *Ross* v. *Protective Indemnity Co.,* 135 Conn. 150, 152. Consequently, where the words used have a definite meaning in common usage and the intent expressed in them is capable of a precise and sensible application to the subject matter of the contract, they must be given that meaning. *Trumbull Electric Mfg. Co.* v. *John Cooke Co.,* supra, 16.

The ordinary meaning of "repair" is to restore to a sound or good state after decay, injury, dilapidation, or partial destruction. Webster's New International Dictionary (2d Ed.); *Littlejohn* v. *Elionsky,* 130 Conn. 541, 543. Nothing is disclosed in the circumstances surrounding the making of this agreement to indicate that the parties intended to use the word in other than this commonly accepted meaning.

The lease of September 18, 1948, embraced not only the north portion of the main house but also the garage apartment. The agreement referred to that lease and without more would seem to have encompassed all of the property described in the lease. The paragraph of the agreement referring to the lease, however, mentions only that portion "pertaining to the northerly one-half of a house . . . known as the Homestead." The second paragraph then goes on to recite the purpose to agree concerning "repairs to be made to said premises." The word "premises" refers to the property concerning which the parties were dealing. *Zandri* v. *Tendler,* 123 Conn. 117, 123. The use of the word "said" in conjunction with the word "premises" means "before mentioned," or "already spoken of." Webster's New International Dictionary (2d Ed.); *Trumbull Electric Mfg. Co.* v. *John Cooke Co.,* supra, 15. Thus the language of the written agreement, standing alone, would contemplate repairs to be made to the northerly half of the main house. In

view, however, of the decedent's experience with leaks in the south side of that house, the discussion of a new roof and siding, and the inclusion of a new water system, it is proper to construe the intention to be to provide for repairs to the entire main house.

The evidence makes it abundantly clear that the decedent was content with the essential construction and arrangement of the house. Her age and situation negative any purpose to remodel it or the building in the rear. Under the 1947 lease she had already established her income basis for the next ten years from the garage apartments and half the main house. The plaintiff had leased those portions as they then stood, with the privilege, concededly at his own expense, to make alterations. The renewal privilege of the 1948 lease was to the plaintiff's advantage, but gained the decedent nothing. After obtaining the estimates of contractors amounting substantially to the sum which the plaintiff claims subsequently to have spent on the property, both parties knew that the decedent did not want to spend that much.

The plaintiff, however, embarked upon a program, not of repairs to the main house, but of a complete remodeling of both buildings at a claimed cost of $12,761.69, including rubber tile floors, insulation, inside sheathing, papering and painting, the changing of partitions, the finishing off of new rooms, landscaping, and other items not necessary to mention. His own acknowledgment of this is implicit in a claim which he filed after the one in issue and after the time limited for claims had expired. Most of this expenditure appears to have been made upon his leased premises. It seems quite apparent that the plaintiff's aim was to remodel his leased premises extensively in order to make them more attractive to tenants. The success of his undertaking is indicated partially by the fact that he rents each of the apartments in the remodeled garage for $50 per week. If he were to be permitted to recover from the decedent's estate one-half of the moneys claimed to have been expended on the entire property, he would be compensated not only for one-half of the cost of the repairs for which he contracted but also for alterations contemplated by his lease. The decedent cannot be held liable for work done beyond the scope of repairs upon any theory of unjust enrichment because it is not shown that she had any real knowledge of what the plaintiff was doing and also because of this latter provision of the lease.

It is impossible to classify a great many of the disbursements for labor and material. Materials were purchased and craftsmen employed in connection with all types of work on the entire property. Some items can be allocated to one or the other of the buildings but it is impossible to determine fully how much of that which went into the main house is properly attributable to repairs. With respect to the new water system it is impossible to segregate complete costs from plumbing expense which included items beyond the scope of the agreement. Similarly the cost of the new steps contracted for is intermingled with other work beyond the scope of the agreement.

Expenditures which can be ascertained within the scope of the agreement are as follows:

| | |
|---|---:|
| Shingling, labor and materials for siding, porch repairs, and exterior painting | $1341.00 |
| Shingles | 168.00 |
| Drilling well | 935.00 |
| Plumbing | 461.72 |
| Screen materials | 108.00 |
| Screen doors | 45.00 |
| | $3058.72 |

One-half of this total represents an indebtedness for which the deceased had contracted prior to her death and is a proper obligation of her estate. *Roth* v. *Ravich,* 111 Conn. 649, 652. The plaintiff is not entitled to a judgment for the recovery of the decedent's one-half share of this total at this time but is entitled to withhold the monthly rental of thirty dollars due under his lease on account of the indebtedness until it is paid. The plaintiff to date has recognized this provision of the agreement and has paid no rent since September 18, 1948.

Judgment may enter accordingly.